IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

                **Plaintiff**,

v.

KRISSY GORSKI (02),

                **Defendant**.

Case No. 20-20018-02-DDC

## MEMORANDUM OPINION

Krissy Gorski's Motion for Compassionate Release (Doc. 146) returns to this court on remand (Doc. 169) from the Tenth Circuit. Ms. Gorski asserts that her family circumstances presented extraordinary and compelling reasons for her release because her children's caregivers had passed away, and she was the only remaining caregiver. She also argues that the § 3553(a) sentencing factors favored her release. Once the Circuit remanded the case, the government decided not to oppose Ms. Gorski's motion. Doc. 186 at 3. The court thus granted the motion in its Order issued November 13, 2023, albeit with substantial reservations about some of Ms. Gorski's arguments. Doc. 189. The court now explains the reasons for its decision.

### I.   Background

The court first describes Ms. Gorski's offense conduct, then her sentence, and, finally, her Motion for Compassionate Release.

Law enforcement agents sought to arrest Dustin Schultz-Bergin—Ms. Gorski's co-conspirator and co-defendant—whom they suspected of supplying illegal drugs in the Kansas City area. Doc. 138 at 6 (Presentence Investigation Report ¶ 15). Mr. Schultz-Bergin, who aspired to become a bigger drug dealer, had a connection to a Mexican drug cartel. *Id.*

(Presentence Investigation Report ¶ 16).  His source dealt with a supplier in Juarez, and she wanted to deliver the drugs to Mr. Schultz-Bergin in El Paso.  *Id.*

On January 23, 2020, members of the DEA's Northeast Kansas Multi-Jurisdictional Task Force located Mr. Schultz-Bergin at the Matfield Green Service Area in Chase County, Kansas, traveling back through Kansas en route from El Paso, Texas.  *Id.* at 7 (Presentence Investigation Report ¶ 17).  Law enforcement officers observed a woman, later identified as Ms. Gorski, driving the car.  *Id.* (Presentence Investigation Report ¶ 18).  Mr. Schultz-Bergin, Ms. Gorski, and another woman got out of the car at Matfield Green.  *Id.*  The two women went inside to the restroom area while Mr. Schultz-Bergin remained outside, smoking a cigarette.  *Id.*

Two KHP Troopers, coordinating with the Task Force, approached Mr. Schultz-Bergin with guns drawn.  They announced that he was under arrest.  *Id.* (Presentence Investigation Report ¶ 19).  Mr. Schultz-Bergin rejected the Troopers' instructions.  *Id.*  He ran around the car Ms. Gorski had driven to Matfield Green, got into it, and forcibly backed the car into the Troopers' patrol car.  *Id.*  He then fled onto the Kansas Turnpike in Ms. Gorski's car, leading law enforcement officers on a high-speed chase.  *Id.*  Law enforcement officers eventually managed to disable the car.  Mr. Schultz-Bergin fled again, this time on foot with gun in hand.  *Id.*  A KHP Trooper shot Mr. Schultz-Bergin during his flight.  *Id.*  Everyone survived.

Law enforcement officers then located Ms. Gorski in the Matfield Green bathroom.  *Id.* at 9 (Presentence Investigation Report ¶ 27).  The car she had driven to Matfield Green—the one Mr. Schultz-Bergin had used to flee from the Troopers—was one Ms. Gorski had rented.  *Id.*  Ms. Gorski told the officers that, initially, she had agreed to go to El Paso with Mr. Schultz-Bergin and thought the trip's purpose was to pick up money in El Paso.  *Id.*  But eventually, Mr. Schultz-Bergin informed Ms. Gorski about the true purpose of the trip:  drugs.  *Id.* (Presentence

Investigation Report ¶ 28). Ultimately, Ms. Gorski confirmed that she had travelled to El Paso with Mr. Schultz-Bergin to retrieve illegal drugs and transport them back to Kansas City. *Id.* Mr. Schultz-Bergin had offered and Ms. Gorski had agreed to accept $500 to drive him in her rental car. *Id.*

Law enforcement officers searched Ms. Gorski's rental car and found methamphetamine in its trunk. *Id.* at 8 (Presentence Investigation Report ¶ 22). Tests confirmed the trunk held more than three kilograms of methamphetamine. *Id.* In July 2020, the government filed a Superseding Indictment, charging Mr. Schultz-Bergin with three crimes, and Ms. Gorski with one. Doc. 31. On September 23, 2021, Ms. Gorski pleaded guilty to one count of conspiracy to distribute and possession with intent to distribute 50 grams or more of methamphetamine, violating 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A)(viii), and 846. Doc. 114 at 1; Doc. 142 at 1.

Ms. Gorski's Presentence Investigation Report calculated her total offense level of 29. Doc. 138 at 17 (Presentence Investigation Report ¶ 63). The Presentence Investigation Report also calculated her Criminal History Category as VI—the highest rung of the Criminal History Categories recognized by the Sentencing Guidelines. *Id.* at 25 (Presentence Investigation Report 84).[1] Ms. Gorski's total offense level and criminal history category produced a guideline range of 151 to 188 months. *Id.* at 33 (Presentence Investigation Report ¶ 129). On March 3, 2022, the court sentenced Ms. Gorski to a sentence far below her guideline range—60 months. Doc. 142 at 2. Ms. Gorski's release date (before the court recently ordered her released) was December 7, 2025. Krissy Gorski (Reg. No. 30095-031), https://www.bop.gov/inmateloc/ (last

---

[1] Ms. Gorski had accumulated 18 criminal history points. So, if the Guidelines' Criminal History Categories continued above Category VI on the same scale as it uses elsewhere, her criminal history points would make her a Category VII offender.

visited Nov. 6, 2023). With Ms. Gorski's offense conduct, criminal history, and underlying sentence in mind, the court now turns to her family circumstances.

Ms. Gorski's Presentence Investigation Report included extensive details about her family circumstances. It provided that "her children were removed from her custody and became Wards of the State after she relapsed[.]" Doc. 138 at 28–29 (Presentence Investigation Report ¶ 94). All this happened before 2020, when Ms. Gorski engaged in the criminal conduct leading to her conviction here.

Despite her background, Ms. Gorski performed well while on pretrial release. *Id.* at 6 (Presentence Investigation Report ¶ 10). She complied with all court-imposed conditions of release, reported as directed, and attended vocational school fulltime. *Id.* She experienced "no substance-related issues," participated in mental health services, and successfully completed outpatient treatment. *Id.*

The court sentenced Ms. Gorski in March 2022. Three months later, on June 6, 2022, Ms. Gorski filed a pro se Motion for Compassionate Release. Doc. 146. The motion explained that Ms. Gorski's children needed a caregiver. *Id.* at 1. Ms. Gorski had planned for her stepmother and sister to care for her children during her time in custody, but her stepmother died on March 22, 2022, and her sister died 16 days later. *Id.* at 1–2. Without any family to care for them, the children were placed in a temporary foster home. *Id.* at 2.

The government opposed Ms. Gorski's motion, *see* Doc. 149, and the court denied Ms. Gorski's Motion for Compassionate Release. *United States v. Gorksi*, No. 20-20018-02-DDC, 2022 WL 4482483, at *1 (D. Kan. Sept. 27, 2022), *rev'd*, No. 22-3244, 2023 WL 4446354 (10th Cir. July 11, 2023). The court concluded that Ms. Gorski had failed to present extraordinary and compelling reasons warranting compassionate release because she had failed to show that she

4

had legal custody of the children. *Id.* at *3. There was no guarantee, the court reasoned, that the state of Kansas would return the children to her. *Id.* The court also concluded that the relevant sentencing factors didn't favor Ms. Gorski's release. The court noted that Ms. Gorski's prior criminal convictions placed her in the highest criminal history category. *Id.* Also, the court emphasized the dangerous activity that inhered within her relevant conduct for her offense of conviction: she willingly assisted an armed trip to secure methamphetamine that ended in a high-speed chase on a public highway, ending in a shooting of her co-conspirator. *Id.* The court also noted that Ms. Gorski had not yet served even a quarter of her far below-guidelines sentence of 60 months. *Id.* The court thus found that the sentencing factors weighed heavily against compassionate release. *Id.*

The Tenth Circuit reversed and remanded. *United States v. Gorski*, No. 22-3244, 2023 WL 4446354 (10th Cir. July 11, 2023). The Circuit faulted this court's analysis of the extraordinary and compelling reasons requirement because it neglected Ms. Gorski's evidence that she had custody of the children. *Id.* at *3–4. And, the Circuit concluded, the court didn't address "the fact that Ms. Gorski's only apparent impediment to custody was her incarceration, which would no longer be a problem if she were to obtain compassionate release." *Id.* at *3. The Circuit also emphasized that the children's guardian ad litem and foster care case manager had approved of reintegrating Ms. Gorski with her children. *Id.* The Circuit thus could not "determine whether the district court appropriately exercised its discretion in denying the existence of extraordinary and compelling reasons." *Id.* at *4.

The Circuit also held that the court had committed factual error when it evaluated the § 3553(a) factors. *Id.* The Circuit's opinion concluded "the district court clearly erred to the

5

extent that it had found [Ms. Gorski's] participation in Mr. Schultz-Bergin's shootout with troopers." *Id.*  The Circuit explained this conclusion this way:

> Ms. Gorski had nothing to do with the shootout between troopers and Mr. Schultz-Bergin.  Indeed, she was in a bathroom when troopers approached Mr. Schultz-Bergin to arrest him.  Even when Mr. Schultz-Bergin jumped in Ms. Gorski's car and sped off, she was away from the scene.  In fact, Mr. Schultz-Bergin left her behind as he tried to get away from the troopers and engaged in the shootout.

*Id.*

With this background, the court returns to the issues remanded by the Circuit.  And the court also considers new developments since the Circuit's remand.  Specifically, Ms. Gorski filed an updated memorandum to support her compassionate release motion.  Doc. 185.  Also, the Sentencing Commission had adopted a new policy statement broadening the reach of the "exceptional circumstances" requirement.  And, importantly, the government informed the court that it no longer opposed Ms. Gorski's compassionate release.

The court begins its analysis by outlining the governing legal standard.

## II.      Legal Standard

"Federal courts are forbidden, as a general matter, to modify a term of imprisonment once it has been imposed, but that rule of finality is subject to a few narrow exceptions.  One such exception is contained in [18 U.S.C.] § 3582(c)(1)." *United States v. Maumau*, 993 F.3d 821, 830 (10th Cir. 2021) (quotation cleaned up).  Even after a court has imposed a term of imprisonment, it may modify that term "upon motion of the defendant after [1] the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prisons to bring a motion on the defendant's behalf or [2] the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier[.]"  18 U.S.C. § 3582(c)(1)(A).  This exhaustion requirement, our Circuit has held, is a claim-processing rule that the government may waive or forfeit.  *United States v. Hemmelgarn*, 15 F.4th 1027, 1030–31 (10th Cir. 2021).

Aside from this exhaustion requirement, the court applies a three-step analysis to the substance of compassionate release motions filed under § 3582(c)(1)(A). *United States v. McGee*, 992 F.3d 1035, 1042 (10th Cir. 2021). It provides that a federal district court may grant a motion for reduction of sentence only when it:

1. finds that extraordinary and compelling reasons warrant such a reduction;
2. finds that such a reduction is consistent with applicable policy statements issued by the Sentencing Commission; and
3. evaluates the factors set forth in § 3553(a), to the extent that they are applicable.

*Id.*; *see United States v. Wesley*, 60 F.4th 1277, 1282 (10th Cir. 2023) (citing the Sentencing Reform Act of 1984). Relief may "be granted only if all three prerequisites are satisfied," and so, "the court may consider the three steps in any order." *United States v. Hald*, 8 F.4th 932, 942 (10th Cir. 2021).

The court now applies this governing standard to Ms. Gorski's renewed motion following remand, staying within the confines of the Circuit's remand.

### III.     Analysis

The court begins its analysis of these three requirements by considering together steps one and two—that is, whether Ms. Gorski has demonstrated extraordinary and compelling reasons for compassionate release, as informed by the Sentencing Commission's policy statements. The court then addresses step three—whether the § 3553(a) factors favor Ms. Gorski's release.

#### A.     Extraordinary and Compelling Reasons

The court revisited its earlier conclusion and, as explained below, found that Ms. Gorski's family circumstances qualify as an extraordinary and compelling reason for her release.

Ms. Gorski's sons lived with her until the court sentenced her to prison in March 2022. She'd planned for her stepmother and sister to care for the children during her incarceration, but both caretakers passed away unexpectedly. The children's father remains legally incapacitated. Ms. Gorski thus is her children's sole remaining, available caregiver other than the state's foster care system. The court found these circumstances qualify as extraordinary and compelling. This conclusion isn't one that the court reached easily.

To be sure, many of the offenders it sentences face dire family circumstances. This is a sad and prevalent theme of many Presentence Investigation Reports. But Ms. Gorski's circumstances differ in severity and depth from those experienced by most of her fellow offenders. Her children are young: ages 10 and 11. And, thanks to admirable efforts while on pretrial release, Ms. Gorski managed to regain legal custody of both children before her incarceration. While Ms. Gorski may or may not succeed in gaining full custody of her children after her release, she submitted documents from state authorities who support reintegrating Ms. Gorski with her children.

The second step of the Circuit's analysis asks whether the reduction sought by the defendant's motion "is consistent with applicable policy statements" from the Sentencing Commission. *McGee*, 992 F.3d at 1042. This inquiry now differs from the first time the court decided Ms. Gorski's motion. The Sentencing Commission since has issued newly amended policy statements that took effect November 1, 2023. *See* U.S.S.G. § 1B1.13. And the Sentencing Commission's new policy maintains that "the death or incapacitation of the caregiver

of the defendant's minor child" qualifies as an extraordinary and compelling reason to reduce a sentence.[2]  *Id.* at § 1B1.13(b)(3).

In sum, the court found that Ms. Gorski's motion satisfies steps one and two of the compassionate release analysis. Part B, following below, takes on the third step our Circuit's standard: the § 3553(a) factors.

### B.   § 3553(a) Factors

At the last step of the analysis, the court considers whether the § 3553(a) factors support compassionate release. Those factors include: the nature and circumstances of the offense; Ms. Gorski's history and characteristics; the seriousness of her offense; the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public; the need for rehabilitative services; the applicable guideline sentence; and the need to avoid unwarranted sentencing disparities among similarly-situated defendants. *See* 18 U.S.C. § 3553(a). If the modified sentence proposed by a defendant strays too far from the original sentence, the § 3553(a) factors cannot support the sentence reduction— even where a defendant faces extraordinary and compelling circumstances. *See United States v. Pope*, No. 16-10039-JTM, 2020 WL 5704270, at *1 (D. Kan. Sept. 24, 2020); *United States v. Kaufman*, No. 04-40141-1-JTM, 2020 WL 4196467 at *2 (D. Kan. July 21, 2020).

#### 1.   Identifying the Scope of Ms. Gorski's Offense

Several of the § 3553(a) factors require the court to identify—closely—the scope of Ms. Gorski's offense. For instance, § 3553(a)(1) requires the court to evaluate "the nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). Section 3553(a)(2)(A) mandates that a

---

[2]   Because the court finds applicable authority in the Sentencing Commission's "Family Circumstances" policy statement, it need not consider Ms. Gorski's arguments about the policy statement's catch-all provision. *See* Doc. 185 at 13–18 (citing U.S.S.G. § 1B1.13(b)(5)).

sentence "reflect the seriousness of the offense" and "provide just punishment for the offense." *Id.* at § 3553(a)(2)(A). Subpart (C) of the same section requires courts to consider the need "to protect the public[.]" *Id.* at § 3553(a)(2)(C). The court thus defines the scope of Ms. Gorski's offense in two parts, below. First, part a. identifies the relevant legal principles guiding this analysis. Second, part b. applies those principles to Ms. Gorski's offense.

### a. Relevant Conduct

Federal courts use the United States Sentencing Guidelines to inform their sentencing decisions. In broad terms, the pertinent guideline recognizes two possible sources of the "relevant conduct" attributable to a defendant's offense. The first makes the defendant accountable for "all acts and omissions committed, aided, abetted, . . . or willfully caused by the defendant" herself. U.S.S.G. § 1B1.3(a)(1)(A). The second source applies to a "case of jointly undertaken criminal activity"—JUCA, for short. This JUCA prong applies to Ms. Gorski's offense—conspiracy to distribute methamphetamine—because it qualifies as "a criminal plan, scheme, endeavor or enterprise undertaken by the defendant in concert with others. . . ." U.S.S.G. § 1B1.3, cmt. 3.

Highly summarized, JUCA attributes "all acts and omissions of others" to the defendant when the others' acts are:

(i)   within the scope of the jointly undertaken criminal activity;

(ii)  in furtherance of that criminal activity; and

(iii) reasonably foreseeable in connection with that criminal activity.

*Id.* And these attributed acts include ones that "occurred during the commission of the offense of conviction, in preparation for that offense," or while trying "to avoid detection or responsibility for that offense[.]" *Id.*

10

Our Circuit has illustrated how JUCA works in a number of cases—including *United States v. Patton*, 927 F.3d 1087, 1091 (10th Cir. 2019). There, defendant Patton had functioned as "the getaway driver in a string of armed robberies that ended in his arrest." *Id.* at 1090. "An hour after [Mr. Patton's] arrest, his associate shot a police detective who was investigating the pair's most recent robbery." *Id.* At his sentencing, Mr. Patton argued that his co-defendant's shooting of the detective didn't count as his relevant conduct because officers already had arrested Mr. Patton when his associate shot the detective. *Id.* at 1092–93. The district court rejected this argument, concluding that the associate's shooting qualified as Mr. Patton's relevant conduct under the JUCA principle because it satisfied all three requirements of Guideline § 1B1.3(a)(1)(B). *Id.* at 1093. On appeal, Mr. Patton challenged whether his co-defendant's shooting of the detective satisfied the "within the scope of" and "in furtherance of" requirements in the JUCA guideline. The Circuit, in a published opinion, affirmed the conclusion that the associate's shooting qualified as Mr. Patton's relevant conduct.

The shooting satisfied the "within the scope of" requirement, the Circuit held, because "robberies carry with them the inherent prospect that someone could be injured," and "violence against a victim is within the scope of an armed robbery." *Id.* at 1095–96 (citation and internal quotation marks omitted). *Patton* also ruled that a defendant's "relevant conduct includes acts and omissions 'in the course of attempting to avoid detection or responsibility' for the offense." *Id.* at 1096 (quoting U.S.S.G. § 1B1.3(a)(1)(B)). Also, *Patton* affirmed the finding that the associate's shooting of the detective was "in furtherance of the jointly undertaken robbery" even though law enforcement officers already had arrested Mr. Patton when the shooting occurred. The Circuit reasoned that the other defendant's shooting qualified as Mr. Patton's conduct because Mr. Patton's associate "was still at large and attempting to elude police—one of the

11

goals of a joint robbery." *Id.* The Circuit concluded by explaining that Mr. Patton's "absence from the scene of the shooting does not limit his relevant conduct." *Id.*

### b. Applying These Principles Here

The court now applies these principles to identify the "nature and circumstances" of Ms. Gorski's offense of conviction here and its "seriousness."

Starting with the first source of accountability recognized by the Sentencing Guidelines, Ms. Gorski is responsible for all her own actions. She chose to join and support the efforts of an ambitious drug trafficker, one who aimed to bring kilograms of imported methamphetamine from Mexico to the Kansas City market. Doc. 138 at 9 (Presentence Investigation Report ¶ 29) (reciting that Ms. Gorski's co-defendant, "Schultz-Bergin[,] advised Gorski at some point that they were going to be picking up eight kilograms of methamphetamine." (emphasis omitted)); *see also id.* at 10 (Presentence Investigation Report ¶ 32) ("Gorski advised that she believe[d on the day of her co-defendant's arrest] that there would be another vehicle coming up [the day after the arrest] with more heroin and methamphetamine in it and that Schultz-Bergin [was] supposed to pick up those drugs as well when [they] arrived." (emphasis omitted)). Ms. Gorski plainly is accountable for her own actions assisting this drug trafficking conduct.

The second source of accountability—the JUCA prong of relevant conduct—presents a more complicated question. In its original Order denying the motion for compassionate release, the court attributed some actions taken by Ms. Gorski's co-conspirator—Mr. Schultz-Bergin—to her. The court noted that Ms. Gorski had made a trip to the Mexican border with Mr. Schultz-Bergin, "willingly assist[ing] his efforts to bring those drugs to Kansas City to distribute them there." *Gorski*, 2022 WL 4482483 at *2. The court also noted that her offense "involved Kansas Highway Patrol troopers engaging in a high-speed chase with her co-defendant" after he fled

12

from those officers and "ending when her co-defendant sustained injuries in a gun battle with those same officers." *Id.* Without saying so explicitly, the court reasoned that Ms. Gorski's co-defendant's actions were part of her relevant conduct under the JUCA prong of § 1B1.3(A)(1)(B) even though she wasn't present for the dangerous flight from officers. And so, the court concluded that it should consider her co-defendant's actions when it evaluated "the nature and circumstances of her offense"—among other § 3553(a) factors.

But the Circuit rejected this reasoning on appeal. It held that the court "clearly erred to the extent that it found her participation in Mr. Schultz-Bergin's shootout with troopers." *Gorski*, 2023 WL 4446354 at *4. As the Circuit concluded, "Ms. Gorski had nothing to do with the shootout between troopers and Mr. Schultz-Bergin." *Id.* The Circuit also explained that a district court abuses its discretion "when it decides a case based 'on either a clearly erroneous finding of fact or conclusion of law.'" *Id.* (quoting *DG ex rel. Stricklin v. Devaughn*, 594 F.3d 1188, 1194 (10th Cir. 2010)). It thus reversed and remanded for further proceedings. *Id.*

It's important to identify the scope of these proceedings, on remand. The mandate rule limits what this court can, and cannot decide on remand. In general, when a district court hears a case on remand under a mandate—as here—the district court "cannot vary it, or examine it for any other purpose than execution; or give any other further relief; or review it, even for apparent error, upon a matter decided on appeal; or intermeddle with it, further than to settle so much as has been remanded." *United States v. Amedeo*, 487 F.3d 823, 830 (11th Cir. 2007) (citation and internal quotation marks omitted). Instead, "'a district court must comply strictly with the mandate rendered by the reviewing court.'" *Huffman v. Saul Holdings Ltd. P'ship*, 262 F.3d 1128, 132 (10th Cir. 2001) (quoting *Ute Indian Tribe v. Utah*, 114 F.3d 1513, 1520–21 (10th Cir. 1997)).

The court apprehends the Circuit's opinion here to decide the question whether Mr. Schultz-Bergin's flight and armed resistance to the pursuing troopers is part of Ms. Gorski's relevant conduct—and thus part of the nature and circumstances of her offense. Specifically, the Circuit decided that: "Ms. Gorski had nothing to do with the shootout between troopers and Mr. Schultz-Bergin." *Gorski*, 2023 WL 4446354 at *4. Given the Circuit's explicit conclusion on this front, the court perceives no authority to revisit that issue. So, the analysis below analyzes the § 3553(a) factors without attributing any of her co-defendant's flight and armed resistance to Ms. Gorski's offense.[3]

### 2. Analysis of the § 3553(a) Factors

Ms. Gorski requested the court to reduce her sentence to time served. Ms. Gorski had served a little more than one and a half years of her five-year sentence. Her release date was December 7, 2025, when the court issued its Order releasing her, presumably because she earned good time credits. So, just over two years remained on Ms. Gorski's original five-year sentence. Though it's a close question, the court concluded that § 3553(a) factors had shifted just far enough to justify a reduced sentence. The court emphasizes, however, that the government's decision not to contest Ms. Gorski's motion played a significant part in this ruling.

The court begins with Ms. Gorski's personal history and characteristics. The court recognizes (and commends) Ms. Gorski's rehabilitative conduct while on pretrial release and while in custody for the last year and a half. She honored all her conditions of pretrial release

---

[3] One could read part of the Circuit's opinion to suggest that the Circuit didn't mean to preclude assessment—on remand—of Ms. Gorski's accountability for Mr. Schultz-Bergin's armed flight from officers. *See Gorski*, 2023 WL 4446354 at *4 ("It is not apparent to us how the § 3553(a) factors would apply on remand *if the district court were to drop* reliance on Ms. Gorski's participating in the shootout.") (emphasis added). But other aspects of the opinion overwhelm the lone passage supporting this interpretation of the scope of the remand. *Id.* ("But the district court clearly erred to the extent that it found her participation in Mr. Schultz-Bergin's shootout with troopers.").

14

and she incurred no disciplinary violations while in custody. The court also credits Ms. Gorski's admirable rehabilitative efforts while on pretrial release—she maintained her sobriety for nearly two years on pretrial release and secured legal custody of her children. These efforts support Ms. Gorski's bid for a reduced sentence.

But Ms. Gorski's criminal history necessarily mutes the court's optimism. Her record demonstrates that she can live a law-abiding life for lengthy periods. After collecting seven felony convictions between 2003 and 2009, Ms. Gorski went almost nine years without any convictions between 2009 and 2018. Doc. 138 at 18–25 (Presentence Investigation Report ¶¶ 68–82). But her history equally demonstrates that a long span of sober, law-abiding conduct is no guarantee of future success. In mid-2018, she resorted to substance-related criminal conduct and in early 2019, she sustained a felony conviction for heroin possession. *Id.* at 24–25 (Presentence Investigation Report ¶ 81). Less than a year later, she enlisted in the criminal enterprise that led to her conviction here, using her car to drive a wholesale drug trafficker to the Mexican border so he could retrieve a volume of methamphetamine to distribute.

The second factor asks the court to consider Ms. Gorski's sentence relative to the nature and seriousness of her offense. Ms. Gorski's motion emphasized her "lack of violence and minimal participation in the offense." Doc. 185 at 22. And, her motion argued, "Ms. Gorski does not require further imprisonment as a matter of retributivist justice for her non-violent participation in her co-defendant's drug scheme." *Id.* The court takes this argument one word at a time, starting with "minimal." The court agrees that Ms. Gorski participated minimally. Law enforcement officers found their way to Ms. Gorski after targeting Mr. Schultz-Bergin's drug distribution scheme. And it was Mr. Schultz-Bergin's plan to drive to the Mexican border to acquire illegal drugs—not Ms. Gorski's. These reasons, among others, persuaded the court, at

15

sentencing, to impose a sentence so far below the Guideline range.  So, in most respects, her arguments here seek a second dose of credit for the same mitigating factor.  Next: "retributivist." Ms. Gorski's guideline range was 151 to 188 months, driven in large part by her criminal history category of VI—the highest mark available under the Guidelines.  The court's 60-month sentence represented a significant downward variance from a guideline sentence.  The court thus rejects Ms. Gorski's use of the term "retributivist."  This factor isn't persuasive.  It doesn't favor her release.  Last: "non-violent."  It's true that Ms. Gorski herself didn't act violently.  But it's also true that she spent three days in her car with a drug trafficker who took two guns with him in Ms. Gorski's car on their fatal trip.[4]

       The § 3553(a) factors also direct the court to evaluate the need for a sentence to provide just punishment, promote respect for the law, reflect the seriousness of the offense, deter crime, and protect the public.  The government concluded that Ms. Gorski doesn't appear to pose a threat to the community.  Doc. 186 at 10.  And the government asserted that Ms. Gorski's "biggest challenge will be maintaining her sobriety so that she can find employment and support herself and her children."  *Id.*  That's right.  During Ms. Gorski's 5-year term of supervised release, the United States Probation Office will monitor her management of this challenge.  Any violations during that term will signal significant reason for concern, as would any return to using controlled substances.  The court hopes that the potential loss of her parental rights, along with the possibility of a return to prison—should she violate the terms of her supervised release—will deter Ms. Gorski adequately from further crime.  Doc. 185 at 23.  This factor thus favors Ms. Gorski's release.

---

[4]    *See* Doc. 138 at 7, 8 (Presentence Investigation Report ¶¶ 19, 23) (noting .40 caliber loaded pistol found along path of Mr. Schultz-Bergin's flight on foot and .380 caliber pistol located inside in front passenger side pocket in Ms. Gorski's rental car).

In sum, the § 3553(a) factors have shifted, but just barely far enough to justify reducing Ms. Gorski's sentence to time served. The government explained that it "believes the defendant should be given this one last opportunity to be a mother to her children." Doc. 186 at 10. With some remaining concerns, the court decided to grant her that opportunity. She would do well to make the most of it.

IV.     **Conclusion**

The court therefore concluded, in its discretion, that extraordinary and compelling reasons justified reducing Ms. Gorski's sentence to time served under 18 U.S.C. § 3582(c)(1)(A). For all the reasons discussed above, the court also found that reducing Ms. Gorski's sentence to time served satisfies the § 3553(a) sentencing factors.

**Dated this 1st day of December, 2023, at Kansas City, Kansas.**

<u>s/ Daniel D. Crabtree</u><br>
**Daniel D. Crabtree**<br>
**United States District Judge**